ALITO, Circuit Judge,
dissenting:
If I were a legislator, I would not vote to criminalize the payments to grievance chairmen that are at issue here. I agree with the majority that these payments differ from the corrupt practices that usually figure in prosecutions under Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186. Moreover, I am not certain that the Congress that enacted Section 302 would have chosen to outlaw such payments if it had focused specifically on that question.
Our job, however, is to interpret Section 302 as it is written. “The plain meaning of legislation should be conclusive, except in the ‘rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.’ ” United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). *-517 Here, the majority has not heeded the plain meaning of Section 302 and has not shown that the literal application of the statutory language would lead to a result that is “demonstrably at odds” with congressional intent. I therefore dissent.
As the majority acknowledges, Section 302 prohibits Caterpillar from paying the grievance chairmen unless those payments fall within one of the exceptions set out in Section 302(c), 29 U.S.C. § 186(c). See Maj. Op. at 1053-54. The exception at issue here is that contained in subsection (c)(1), which applies to “any money or other thing of value payable by an employer ... to any representative of his employees, ... who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer.” 29 U.S.C. § 186(c)(1). The union argues that these payments fall within this exception for three separate reasons: (1) they are compensation for the grievance chairmen’s current service as Caterpillar employees; (2) they are compensation for the grievance chairmen’s former service as Caterpillar employees; and (3) they are made “by reason of’ the grievance chairmen’s former service as Caterpillar employees. I briefly discuss each of these theories below.
I.

“As Compensation For” Current Service as a Caterpillar Employee

Although the union’s primary arguments appear to be that the payments are made “as compensation for” or “by reason of’ the grievance chairmen’s past service as regular Caterpillar employees, the union also maintains that these payments are legal because they may be viewed “as compensation for” the grievance chairmen’s work as current Caterpillar employees. The union contends that the grievance chairmen, who are officially on leaves of absence from Caterpillar, are joint employees of Caterpillar and the union. Among other things, the union notes that Section 302(c)(1) seems to contemplate such joint employment, since it permits an employer, under certain circumstances, to make payments to “any representative of his employees ... who is also an employee ... of such employer.” And the union argues that under National Labor Relations Board decisions the grievance chairmen qualify as joint employees.
I find it unnecessary to reach the question whether the grievance chairmen may be considered joint employees. Assuming that they are, I am convinced that Caterpillar’s payments to them are not made “as compensation for” their service as current Caterpillar employees. In their capacity as grievance chairmen, they owe their complete loyalty to the workers they represent. See 909 F.Supp. at 259-60. They plainly work for the union and not for Caterpillar, and as the majority notes, their representation of the workers “often places them in a position adverse to Caterpillar’s.” Maj. Op. at 1054-55.[1]
It is noteworthy that the union’s excellent brief, while arguing strenuously that the chairmen are joint employees, makes little effort to show that the pay and benefits they receive are compensation for services performed for Caterpillar. The union’s brief merely states:
Caterpillar ... realizes substantial benefit from the chairman’s work. As the record shows, the chairman’s job ... is “to make sure that contract works” and if he succeeds, “everyone benefits — the workers, the Company and its production needs, and the Union.” App. 260.
Appellant’s Br. at 48.
This argument seems to me to obliterate the distinction, which is surely significant in the real world, between services performed for an employer and services performed for a union. I do not question the proposition that “everyone benefits” if the contract works; nor do I question the proposition that the grievance chairmen. can help to make the contract work; but I do not think that it follows that the work that they do should be regarded under Section 302(c)(1) as services performed for Caterpillar. By this reasoning, everyone who helps to make *-516 the contract work, including presumably the union officers, could be viewed as working for Caterpillar. And since the union, as well as Caterpillar, benefits when the contract works, everyone who helps to make the contract work, including Caterpillar officers and supervisors, could be viewed as working for the union. Thus, the union’s logic leads to preposterous results. Therefore, regardless of whether or not the chairmen may be technically considered to be joint employees of both Caterpillar and the union, I reject the argument that the payments in question here can be permitted on the theory that they constitute payments made to the chairmen “as compensation for” current services performed by them for Caterpillar. See 909 F.Supp. at 260 n. 14 (because chairmen perform no functions on behalf of Caterpillar, payments are not for services rendered by chairmen to Caterpillar whether or not they can be considered current Caterpillar employees). .
II.
“As Compensation For” Past Service as a Caterpillar Employee
I agree with the majority that the payments made to a grievance chairman do not constitute “compensation for ... his service” as a company employee prior to his selection for a grievance position. This point can be demonstrated by considering the following situation. Suppose that an employee works for a number of years in a certain job category and receives during that period the same wages and other benefits as all the other employees in the same job category with the same seniority. Suppose that the employee is then selected to serve as a grievance chairman, and that he then entirely ceases his prior work and devotes his full time to grievance work, but continues to receive wages and benefits from the employer. It is plain that the wages and benefits that this employee receives after becoming a grievance chairman are compensation for his grievance work, not for the work that he did prior to his selection as a grievance chairman. If these payments were compensation for his prior work, then' his compensation for that work would exceed that of the other employees with equal seniority who had labored in the same job category. Moreover, if the payments were compensation for previously completed work (in other words, if the payments had been fully earned before the employee’s selection as a grievance chairman), the employee would presumably be entitled to receive those payments if, instead of serving as a grievance chairman, he went fishing. But of course that is not the case.
Accordingly, I agree with the majority that the payments at issue here are' not compensation for a grievance chairman’s work prior to his selection for that position. As the majority states: “[t]he chairmen were already compensated for their production line work long ago in the form of wages and vested benefits.” Maj. Op. at 1055. “It is difficult indeed to comprehend how years, even decades, of paid union leave can realistically be thought of as compensation for time spent on the factory floor.” Maj. Op. at 1055.
III.

“By Reason Of’ Past Service as a Caterpillar Employee

While the majority holds that the payments to the grievance chairmen are not “compensation” for their past service, the majority concludes that the payments are “payable ... by reason of’ the grievance chairmen’s former service as Caterpillar employees. In reaching this conclusion, however, the majority does not explain with any specificity what it understands the phrase “by reason of’ to mean. Nor does the majority take note of the clear meaning of that phrase in common parlance. If the majority paid more attention to the meaning of this language, it would be forced to recognize that the payments in dispute here are not made “by reason of’ the grievance chairmen’s past service as Caterpillar employees.
A. Dictionaries define the phrase “by reason of’ to mean “because of’ or “on account of.” See The Random House Dictionary of the English Language 1197 (1967); 2 The Compact Edition of the Oxford English Dictionary 2431 (1971). When x is said to have occurred “by reason of’ y, what is usually *-515 meant is that y was, if not the sole cause of x, at least the or a major cause. If y was simply a “but-for” cause but not a major cause of y, x is not said to have occurred “by reason of’ y.
This pattern of usage can be demonstrated by constructing sentences that use the phrase “by reason of’ to refer to weak “but-for” causes. Such sentences invariably seem inapt and make it apparent that this use of the phrase “by reason of’ is inappropriate. Here are some examples.
President Clinton could not have become President had he not reached the age of 35, but it would be ridiculous to say that he became President “by reason of’ having attained his thirty-fifth birthday.
The Green Bay Packers could not have won Super Bowl XXXI without defeating the San Francisco Forty-Niners in the first round of the playoffs. However, it would seem quite odd to say that the Packers won the Super Bowl “by reason of’ defeating the Forty-Niners.
The judges of this court almost certainly would not have been appointed if they had not graduated from law school. Yet it would seem very strange to say that the judges of this court were appointed “by reason of’ having obtained law degrees.
I believe that these examples show that the phrase “by reason of x” refers at a minimum to a major reason for x, not simply a relatively minor “but-for” cause, and it therefore seems clear that Caterpillar’s payments to the grievance chairmen are not made “by reason of’ their prior service as Caterpillar employees. Such past service may be necessary for election as a grievance chairman (perhaps because Section 302 is thought to require this) and thus to the receipt of the payments at issue, but past service as a regular Caterpillar employee is certainly not the or a major cause for the payments.[2] One way to see this is to consider the fact that Caterpillar has thousands of former employees, but only a very few of them are ever selected as grievance chairmen. Since all have prior service for the company in common, yet only a handful become chairmen, factors other than prior service for the company must be much more important in influencing their selection.
B. It should be noted that nowhere in its briefs does the union urge that the phrase “by reason of’ should be interpreted as requiring merely “but-for” causation. In fact, the government’s brief supporting the union agrees with my interpretation of “by reason of’. Gov’t Br. at 12 (discussing “common understanding of ‘by reason of,’ as synonymous with ‘because,’ ‘on account of,’ owing to,’ ‘due to’ etc.”). See also Appellant’s Reply to Suppl.Br. at 3 (“there is no question” that “an employer may pay a former employee who is also a union official what he is owed because of his service as an employee and not one cent more”) (emphasis in original) (quotation omitted).
Rather, the union’s argument is that “the most natural reading [of “by reason of] is that this phrase refers to payments which an individual earns the right to receive by serving as an employee but which are not, strictly speaking, remuneration for particular hours of work.” Appellant’s Br. at 21 (emphasis added). Accord id. at 34 (“so long as the right to such payments is earned by previously having performed ‘service to the employer’ ”); Appellant’s Reply Br. at 18-19 (“‘preexisting wage and benefit payments’ for an employee elected to a full-time union position qualify as ‘payments by reason of service as an employee, at least where the right to such payments has been collectively bargained and accrued as a result of the employee’s work for the employer.”) (emphasis added) (other emphasis omitted); id. at 21 (the “by reason of’ exception “leaves no room for payments which were not earned by prior service”). The union contends that the Eleventh Circuit’s opinion in United States v. Phillips, 19 F.3d 1565 (11th Cir.1994), cert. *-514 denied, — U.S. —, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995), supports its position that Caterpillar’s payments to the chairmen were “by reason of’ their service as Caterpillar employees. Phillips held that payments by a company to a union official were illegal if the union official “did not have a right to such payment before he severed his employment relationship with the company.” Id. at 1575. The union relies (Br. at 37) on the court’s explanation that “[w]hen an employee’s right to a benefit has fully vested before the leave of absence begins, there is no danger of corruption when the employer delivers the benefit after that employee leaves the company to work for the union_” Id. at 1576.
I agree that a payment from Caterpillar to a former employee now working as a grievance chairman would be legal under Section 302 if the chairman’s right to that payment vested before he became a former employee. This interpretation of the “by reason of’ exception has been adopted by several other courts of appeals. See Phillips, 19 F.3d at 1575; Toth v. USX Corp., 883 F.2d 1297, 1303 n. 8 (7th Cir.), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989). Cf. BASF Wyandotte Corp. v. Local 227, Int’l Chem. Workers Union, 791 F.2d 1046, 1049 (2d Cir.1986).
But the union’s argument fails on its own terms here, because it is simply not true that the chairmen’s rights to receive the payments at issue vested before they left Caterpillar’s employ. On the contrary, their rights to receive these payments are conditioned upon their performance of certain duties in their current positions as grievance chairmen. If, as the union argues, the chairmen’s rights to these payments were earned before their employment with Caterpillar terminated, then the chairmen could go fishing all day, every day, instead of processing grievances. Here, contrary to the government’s argument, see Gov’t Br. at 16, the payments made by Caterpillar are measured by the chairmen’s current services for another employer, i.e., the union; they can earn as much as 46 hours’ pay if they perform sufficient work, but if they perform less work they receive less and if they perform no work — if they just go fishing — they get nothing at all. In this respect, then, this case is identical to Trailways, and the union fails completely in its attempt to distinguish it on the ground that the chairmen are paid at a rate set by Caterpillar rather than by the union.
The basic problem with the union’s argument is that it confuses an employee’s eligibility for a payment with his right to it. The chairmen’s prior service as employees of Caterpillar rendered them eligible to receive their Caterpillar salaries if they were elected as chairmen, but their prior service in no way gave them any right to receive any amount of money. In my view, it is obvious that their prior service is not the sole or even a major reason for their receipt of the disputed payments. It thus cannot be said — absent outright linguistic torture — that the payments are made “by reason of’ their prior service.
C. The majority’s main argument in support of its “by reason of’ holding is that under the collective bargaining agreement “every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary.” Maj. Op. at 1056. In other words, the majority views the collective bargaining agreement as providing each employee with the contingent right to receive future payments from the company after that employee’s regular service has terminated (the contingencies being the employee’s selection and subsequent work as a grievance chairperson). Moreover, the majority appears to argue that a bit of each employee’s work under the collective bargaining agreement goes to pay for this contingent right, and the majority therefore reasons that if an employee is later selected as a grievance chairman and receives salary and benefits from Caterpillar, those payments are received “by reason of’ the bit of that employee’s past service that went to pay for this contingent right.
This argument is inventive — but wrong. At the outset, it should be noted that the majority’s argument logically leads to strange results that the majority does not seem to contemplate. The majority’s argument is dependent on a grievance chairman’s *-513 having “paid,” while working as a regular employee, for the contingent right to receive future payments from the employer. Thus, the argument cannot justify the initial negotiation of a collective bargaining agreement containing a provision such as the one in question here. Suppose that a particular company and union had never before agreed on an arrangement under which the company would pay the grievance chairmen but that the company and the union then enter into such an arrangement. The first group of employees chosen as grievance chairmen would not have previously made any “payments” to the employer in exchange for the contingent right to receive future wages and benefits from the employer. Therefore, even under the majority’s theory, the company’s payments to the initial group of grievance chairmen would be illegal. In other words, the majority’s theory leads logically to the weird result that the company and the initial group of grievance chairmen would have to commit federal felonies in order to set in motion the type of arrangement that the majority sanctions.[3]
Moreover, although the majority postulates that regular employees “pay” for the contingent right to receive future compensation from the employer, it is by no means clear that this is true in most cases. Obviously, each regular employee gives up wages and/or other benefits in exchange for the employer’s payments to the grievance chairmen, but what each regular employee is chiefly “paying” for is not the contingent right to receive future payments from the employer but rather the current improvement in the handling of grievances that presumably results from the work of the grievance chairmen. Indeed, under most circumstances, I suspect that virtually all, if not all, of the “payments” made by a regular employee in any particular year go to fund the employer’s payments to the grievance chairmen in that year and not in future years when that employee might himself be a grievance chairman.[4]
Finally and most importantly, postulating that each regular employee “pays” something for the contingent right to future compensation by the employer does not obviate the problem that past service as a regular employee is not the sole or even a major cause of this future compensation. Assuming that each regular employee makes such “payments” and that the payments are a but-for cause of any compensation that this employee may receive in the future as a grievance chairman, there are two other, more important causes of that compensation: selection as a grievance chairman and the satisfactory performance of the work of a grievance chairman on a daily basis. Thus, to say that a grievance chairman is paid year after year after year “by reason of’ his past service as a regular employee makes no more sense than to say that a regular employee is paid year after year after year “by reason of’ his having acquired the qualifications that were necessary for his original hiring.
*-512 For these reasons, it seems clear to me that the payments at issue in this case are made “by reason of’ the chairmen’s grievance work and not “by reason of’ their prior service as regular employees. Consequently, these payments cannot be squeezed into the “by reason of’ exception in Section 302(c)(1), 29 U.S.C. § 186(c)(1), and I am therefore constrained to conclude that these payments are prohibited by the plain language of Section 302.
D. The majority also argues that by exempting payments made “by reason of’ a former employee’s past service in addition to payments made “as compensation for” that service, Congress must have intended that the two phrases refer to different things. I have no quarrel with this elementary principle of statutory interpretation, but I do not agree with the majority’s application of it. The majority fails to acknowledge that three courts of appeals have construed “by reason of’ to refer to a class of payments distinct from those covered by the “as compensation for” exemption, and that those courts have not adopted anything like the interpretation espoused by the majority. Because the Eleventh Circuit’s discussion in Phillips precisely answers the majority’s contention, I quote it at length:
Congress, in using the alternative formulations of “as compensation for” and “by reason of’ in that provision, intended to remove from the statute’s prohibitions two general categories of payments to employees: (1) wages, i.e., sums paid to an employee specifically “as compensation for” work performed; and (2) payments not made specifically for work performed that are occasioned “by reason of’ the fact that the employee has performed (or will perform, in the case of a current employee) work for the employer. The latter category includes employee “fringe” benefits, such as vacation pay, sick pay, and pen-store benefits. Whether “as compensation for” or “by reason of’ service to an employer, all payments from an employer to a union official must relate to services actually rendered by the employee for the section 186(c)(1) exception to apply. * * * An employee’s “right” to receive a “benefit” while on leave with the union has been upheld when it vested before the employee began the leave of absence_ In con-

trast, the section 186(c)(1) exception does not apply when a company pays a union official who was a former employee, but who did not have a right to such payment before he severed his employment relationship with the company.

19 F.3d at 1575 (first and third emphases added) (citations omitted). BASF Wyandotte Corp., on which Phillips principally relied, deemed “fring[e] benefits” such as “vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like” to be within the “by reason of’ exception. 791 F.2d at 1049. Accord Toth, 883 F.2d at 1303 n. 8 (severance payments are “by reason of’ former employee’s past service). These decisions are consistent with Trailways ’ holding that the payments to former employees contemplated by section 302(c)(1) are those that relate to “past services actually rendered by those former employees while they were employees of the company.” Trailways, 785 F.2d at 106 (emphases in original).
Thus, the distinction between the “alternative formulations” is that “compensation” refers to wages paid for specific work performed, while “by reason of’ refers to non-wage payments made after an employee becomes a former employee but earned while he or she was still an employee.[5] In contrast to the Second, Seventh, and Eleventh Circuits, the majority here holds that the “by reason of’ exception refers to wage payments that would not be made but for the recipient’s prior service as an employee.
*-511 E. The only justification for disregarding the plain meaning of the “by reason of’ exception would be that it would produce “a result demonstrably at odds” with congressional intent or “would thwart the obvious purpose of the statute.” Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (quotation omitted), but the majority does not even attempt to make such a showing. I see nothing that demonstrates that following the plain meaning of the statutory language would produce a result that is demonstrably at odds with Congress’ intent. I find nothing conclusive in the legislative history, and while I agree with the majority that the payments in question here are quite different from “bribery and extortion,” Maj. Op. at 1057, there are reasons, many of which are set out in Judge Mansmann’s opinion, why Congress might have wished to preclude such employer payments. I will simply note that this very case serves as an example of why Congress might have wanted to prohibit the payments at issue. The majority’s description of these payments as “innocuous” (Maj. Op. at 1055) ignores the fact that Caterpillar’s decision to stop paying the chairmen’s salaries was designed to “put economic pressure on the Union” during the strike. (App.144) Prohibiting company control over such payments furthers the goal of union independence by removing this weapon from the company’s arsenal. In short, while I am unsure whether this prohibition is on balance desirable or undesirable, I am certain that it is far from absurd. The “explicit statutory direction” that the majority purports to find wanting (Maj. op. at 1057) is plainly contained in the text of Section 302.
The history of “no docking” provisions, which seems to form the centerpiece of the union’s submission, also does not persuade me to disregard the plain statutory language. “No docking” provisions differ, at least in degree, from the type of arrangement that is before us, and there are times in the law when differences in degree are dispositive. In any event, the legality of “no docking” provisions is unsettled; that question is not before us; and, like Judge Mansmann, I would not reach it here.
Since Section 302 is a criminal statute, I would apply the rule of lenity if I thought that the statutory language was ambiguous, see, e.g., Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990), but since I see no ambiguity, I find that rule inapplicable. See Reno v. Koray, — U.S.—,—, 115 S.Ct. 2021, 2029, 132 L.Ed.2d 46 (1995), (rule of lenity applies only “if, ‘after seizing everything from which aid can be derived,’ we can make ‘no more than a guess as to what Congress intended’ ”) (citations omitted). I would therefore affirm the decision of the district court. If this result is not desirable as a matter of public policy, the union and its amicus, the United States, surely understand how to seek correction in Congress.[6]

. I note that the union's brief acknowledges that "the Union certainly exercises primary control over the chairman and derives the primary benefit from his work.” Appellant’s Br. at 45.

. In Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101, 106 (3d Cir.), cert. denied, 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986), we noted that "[w]hile the Union is correct in asserting that had these individuals never been Trailways’ employees they would not be eligible for pension contributions made on their behalf, it does not therefore follow that the pension fund contributions made by Trailways ... were made ‘in compensation for, or by reason of/ their former service to Trailways_"

. I would assume that the same would be true every time a new collective bargaining agreement took effect.

. It makes sense that a regular employee should pay little if anything for the contingent right discussed in the text (as distinct from a current improvement in grievance handling) because, from the standpoint of a wealth-maximizing regular employee, this contingent right has little if any value. This is so for two reasons. First, this contingent right carries little prospect of financial gain. A regular employee, if selected as a grievance chairman, will have to make future contributions of labor (performing the work of a grievance chairman) that are fully worth the wages and benefits that the employer will provide. (Indeed, under the collective bargaining agreement before us here, a regular employee selected as a grievance chairman does not realize any gain in wages or benefits; he continues to receive the same wages and benefits as he did before.) Second, this contingent right probably does little to increase an employee’s chances of obtaining whatever non-monetary gratification may flow from doing the work of a grievance chairman as opposed to the work of a regular employee. Assuming that employees in a particular bargaining unit who are willing to forgo $x per year in exchange for their employer’s payments to the grievance chairmen would be willing to pay the same amount per year in increased union dues so that the union could make these payments, there will be approximately the same number of grievance chairman positions (and therefore approximately an equal chance of performing the work of a grievance chairman) whether or not the grievance chairmen are paid by the employer.

. In Toth, the Seventh Circuit interpreted our decision in Trailways as resting on the proposition that "any compensation continuing beyond the time of an employee's 'past' employment could not be ‘by reason of' [that] employment.” 883 F.2d at 1302. While I am less confident than the Toth court that Trailways should be read so to hold, I agree with the Toth court that some payments made after the termination of the recipient's employment with the company can be made "by reason of” his or her prior employment. What is important is whether the recipient has a right to the payment before he or she leaves the company, not the date on which the payment is actually made or received. See Toth, 883 F.2d at 1302 (criticizing Trailways for this reason).

. Indeed, the government's amicus brief seems at places to amount to a request that we craft a legislative solution to the problem of collective bargaining agreements that call for employers to make payments to former employees who become union officials. According to the government's brief, such payments may violate Section 302 if they are "incommensurate" with the recipient's former compensation as a regular employee, if the recipient negotiated the right to receive those payments, or if the recipient has not worked for the employer in his or her regular job for an extended period and is unlikely ever to return to such work. U.S. Amicus Br. at 26-28. These may be sensible rules, but I am unable to tease them out of the current language of Section 302. They provide material for legislative, not judicial, consideration.